**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

Case No.: 10-CV-80971-RYSKAMP/VITUNAC

UNITED STATES ATTORNEY
GENERAL *Eric H. Holder, Jr.*,

      Plaintiff,

v.

MARY SUSAN PINE,

      Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**THIS CAUSE** comes before the Court on defendant Mary Susan Pine's motion for summary judgment **[DE 66]** filed on September 9, 2011.  The Attorney General filed a response in opposition **[DE 75]** on October 7, 2011.  Ms. Pine replied **[DE 82]** on October 24, 2011.  A hearing was held on November 8, 2011.  This matter is ripe for adjudication.

**I.**    **Facts**

United States Attorney General Eric H. Holder, Jr. initiated the instant action against Ms. Pine on August 18, 2010.  *See* **[DE 1]**.  The amended complaint **[DE 30]** asserts a civil cause of action under the Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. § 248, based on events which occurred on November 19, 2009.  The relevant facts are summarized as follows:

**A. Background**

Ms. Pine is a pro-life advocate who believes, based on her past unfortunate experience with abortion, that women who are considering abortion should be made aware of the available alternatives and assistance programs.  *See* Pine Dep. **[DE 66-1]** at 5-14.  In order to accomplish

1

her mission, Ms. Pine founded a non-profit organization called "F.A.C.E." which stands for Faith, Action, Counseling and Education.[1]  *Id.* at 5.  Ms. Pine, through F.A.C.E., organizes and participates in pro-life demonstrations and projects such as setting up "truth booths" which show the different stages of a child's development.   F.A.C.E. also offers services such as free pregnancy testing and sonograms, as well as post-pregnancy assistance to mothers.  *Id.* at 5-13, 19.  Ms. Pine also engages in what she refers to as "sidewalk counseling" at the Presidential Women's Center (the "PWC") located in West Palm Beach, Florida.  *Id.* at 16-17, 20-21.  The PWC is a clinic which provides reproductive health services to women, including abortions, gynecological exams, sterilization procedures, and pregnancy testing.  Reis Dep. **[DE 66-5]** at 20-21.   The PWC also provides non-pregnancy related services such as HIV testing.   *Id.* Additionally, women often enter the PWC to obtain information about the services available to pregnant women in the community.  *Id.* at 42-43.

Ms. Pine has consistently conducted her sidewalk counseling on the public sidewalk in front of the PWC every week since it moved to its current location on Northpoint Parkway in or about 2001.  **[DE 66-1]** at 16, 34.   Ms. Pine's sidewalk counseling generally consists of approaching vehicles and pedestrians entering and exiting the PWC's parking lot, engaging in conversations about abortion, and offering information and literature about "life-affirming" alternatives to abortion and the resources available to pregnant women.  *Id.* at 19, 21-25.  Ms. Pine uses this method instead of holding up protest signs because she believes that being friendly and offering help to people is a more effective means of changing people's minds about abortion. *Id.* at 18.  Sometimes people stop and accept her literature; many people do not.  *Id.* at 21, 30. Vehicle passengers who do not wish to receive Ms. Pine's literature generally continue to drive

---

[1] According to Ms. Pine, the name "F.A.C.E." is merely coincidental and has nothing to do with the FACE legislation.  *Id.* at 10.

past her without stopping. *Id.* at 18-19, 21, 33, 35.  According to Ms. Pine, aside from holding

out literature in her hand and motioning vehicles toward her, she does not attempt to stop

oncoming vehicles, and she ceases her efforts once the person indicates he or she does not wish

to receive Ms. Pine's information. *Id.* at 18-23.  It is undisputed that Ms. Pine has never used

obscenities or physical threats while conducting sidewalk counseling at the PWC.  **[DE 66-5]** at

22-23.

Vehicles are able to enter and exit the PWC's parking lot through two driveways. *See*

Pine Decl. **[DE 66-6]**.  The designated entrance, which is marked with an "Entrance" sign, is

accessible from a private service road which also services other businesses such as restaurants

and stores. *See id.*; Pleasant Dep. **[DE 66-12]** at 5.  Sidewalk counseling is not permitted at this

entrance because the access road is private property.  Ms. Pine therefore conducts her counseling

activities on the public sidewalks near the PWC's designated exit driveway which leads onto

Northpoint Parkway.  **[DE 66-1]** at 21, 22, 37.  Despite the fact that the exit driveway, which is

approximately thirty-six feet wide, is clearly marked with a "Do Not Enter" sign and a sign

directing drivers to the designated entrance, drivers sometimes use the exit as an entrance. *Id.* at

38; **[DE 66-12]** at 5; **[DE 66-8, DE 66-9]**.  Ms. Pine is thus able to approach vehicles both

entering and exiting the PWC from this location.

In addition to those seeking services at the PWC, the exit driveway is also used by people

delivering food and mail, as well as people seeking directions to other businesses. *Id.* at 29-30,

35; Willoughby Dep. **[DE 66-13]** at 2.  According to Ms. Pine, she approaches and solicits all

vehicles which pass through, regardless of their purpose, including police officers and the food

delivery man.  **[DE 66-1]** at 27-28, 35-36; **[DE 66-13]** at 4-6.  She does this because "she does

not always know why they are there but she wants everyone to know about the life-affirming resources and information she offers." **[DE 66]** at 9.

### B.  The Conduct at Issue

On November 19, 2009, Ms. Pine was engaged in sidewalk counseling at the PWC.  **[DE 66-1]** at 33.  This day was significant to Ms. Pine because it marked the anniversary of the abortion she had many years ago.  *Id.*  West Palm Beach Police Officer Sanjay Raja was on patrol that day, and he had positioned himself so that he could observe Ms. Pine from a distance of approximately 200-300 feet.  Raja Dep. **[DE 66-14]** at 6, 10.  According to Officer Raja's deposition testimony and his written investigation report **[DE 66-15]**, a green sedan began to enter the PWC premises through the exit driveway.  As soon as Ms. Pine noticed the sedan, she "quickly started to walk faster towards the car" and stopped at the front side, causing the vehicle to stop.  **[DE 66-14]** at 2-3; **[DE 66-15]** at 3.  Immediately after the vehicle came to a stop, Ms. Pine approached the driver's window.  The driver rolled the window down, and Ms. Pine proceeded to solicit the male driver and the female passenger.  **[DE 66-15]** at 3.  At some point during the conversation, Ms. Pine handed the passengers a pamphlet through the open driver's side window.  **[DE 66-14]** at 3, 23.  Although Officer Raja could see that Ms. Pine was speaking to the passengers, he could not hear what she was saying.  *Id.* at 16.

According to Officer Raja, the stopped sedan was blocking the flow of traffic on the exit driveway as well as traffic traveling on Northpoint Parkway.  *Id.* at 2-3.  Officer Raja noticed one vehicle which had to drive around the sedan in order to continue on Northpoint Parkway.  *Id.* at 2, 12.  Officer Raja approached the sedan and instructed the driver to proceed into the parking lot.[2]  *Id.* at 12-14, 23.  The driver immediately took the pamphlet from Ms. Pine and proceeded

---

[2] Officer Raja did not specify how long Ms. Pine spoke with the passengers before he intervened.  He merely testified that the conversation was "not long," and that "[i]t wasn't a significant amount of time."  *Id.* at 16.

to park.  *Id.* at 12-14, 23.  Ms. Pine yelled at Officer Raja, insisting that she was within her rights.  *Id.* at 14.  Officer Raja responded by informing Ms. Pine she was violating city and state traffic laws which prohibit impeding traffic entering a medical facility.  *Id.*  No citations were issued to either Ms. Pine or the driver.  **[DE 66-14]** at 19.  Rather, Officer Raja wrote an incident/investigation report and informed the President of the PWC, Mona Reiss, of the situation.  *Id.* at 20-22; **[DE 66-5]** at 35; **[DE-66-15]**.  Officer Raja did not obtain the identities of the passengers or note the vehicle's license plate number in his report, and neither Ms. Pine nor Officer Raja noticed whether the passengers actually entered the PWC building.

The PWC is equipped with a video surveillance system which covers the exit driveway area where the incident occurred.  **[DE 66-5]** at 35.  The PWC's patient records consists of a computer database which stores information for patients who have undergone surgery, as well as a daily sign-in sheet for patients who have scheduled appointments to receive services.  *Id.* at 31-33.  However, certain patients such as those seeking only information or pregnancy testing are not required to sign in.  *Id.*  The sign-in sheets are destroyed each week, and the video surveillance tapes are destroyed every three weeks pursuant to PWC policy.  *Id.* at 29, 31-32.

The day after the incident, November 20, 2009, representatives from the Department of Justice met with the PWC staff, Officer Raja, and another police officer to discuss the incident and determine whether Ms. Pine was in violation of FACE.  **[DE 66-5]** at 26-27.  The Government concedes that at no time during or after this meeting did it request the PWC to produce any documents or preserve evidence.  *Id.* at 26-27; Ford Dep. **[DE 66-17]** at 3.  The sign-in sheets and video surveillance tapes from date of the incident were thus destroyed pursuant to the PWC's document maintenance policy, making Officer Raja the only witness

(aside from Ms. Pine) to the events at issue.  The passengers' identities and their purpose for entering the PWC premises remain unknown.

## II.        Standard on Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)(1)(A)).  Where the non-moving party bears the burden of proof on an issue at trial, the movant may meet its burden by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325.

After the movant has met its burden under Rule 56(c), the burden shifts to the non-moving party to establish that there is a genuine issue of material fact.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  Although all reasonable inferences are to be drawn in favor of the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), he "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  The non-moving party may not rest upon the mere allegations or denials of the adverse party's pleadings, but instead must come forward with "specific facts showing that there is a *genuine issue for trial*."  *Id.* at 587 (citing Fed. R. Civ. P. 56(e)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Id.*  "A mere scintilla of evidence

supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, the moving party is entitled to a judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 323.

## III.   Analysis

FACE was enacted by Congress in 1993 as a response to nationwide violence arising from protests and demonstrations on the highly controversial topic of abortion. S. Rep. No. 103-117, at 3-12 (1993), *available at* 1993 WL 286699; H.R. Rep. No. 103-306, at 2-3 (1993), *reprinted in* 1994 U.S.C.C.A.N. 699, *available at* 1993 WL 465093; *Cheffer v. Reno*, 55 F.3d 1517, 1518 (11th Cir. 1995). FACE protects a person's right to obtain or provide "reproductive health services," including abortions, by providing civil and criminal remedies to those who have been aggrieved by the prohibited conduct. 18 U.S.C. § 248. To prevail on a FACE claim, the plaintiff must prove that the defendant (1) by force or threat of force or by physical obstruction; (2) intentionally injured, intimidated or interfered with or attempted to injure, intimidate or interfere with any person; (3) because that person is or has been obtaining or providing reproductive health services, or in order to intimidate such person or any other person or any class of persons from obtaining or providing reproductive health services.[3] *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 680-81 (11th Cir. 2001) (quoting 18 U.S.C. §§ 248(a)(1)[4]).

---

[3] Other cases separate FACE into four elements by splitting the second element in two. *See, e.g., Lotierzo v. Woman's World Med. Ctr., Inc.*, 278 F.3d 1180, 1182 (11th Cir. 2002) (FACE plaintiff must prove (1) force, threat of force, or physical obstruction; (2) done with the intent to; (3) injure, intimidate, or interfere with a person or attempt to do so; (4) because that person has sought or provided, or is seeking or providing, or will seek or provide, reproductive health services.). *See also United States v. Mahoney*, 247 F.3d 279, 282 (D.C. Cir. 2001).

[4] FACE provides civil remedies and criminal penalties against anyone who "by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or

Ms. Pine argues that summary judgment should be granted in her favor on grounds that the Government has not met its burden of proving: (1) that Ms. Pine physically obstructed or interfered with the passengers in the sedan; and (2) that the passengers were seeking reproductive health services at the PWC.  With respect to the latter argument, the parties vehemently disagree as to whether a FACE claim requires such proof at all.  According to the Government, it is only required to prove that Ms. Pine, the accused, acted with the requisite intent; whether or not the passengers were in fact seeking reproductive health services is irrelevant.  Ms. Pine argues that a valid FACE claim exists only upon proof that the persons allegedly aggrieved are members of the statute's protected class.

Ms. Pine further argues for an adverse inference against the Government for violating its duty to preserve critical evidence relating to this case, namely the PWC's video surveillance tapes and sign-in sheets from the date of the incident.  Finally, Ms. Pine argues that FACE's civil penalties are unconstitutional on its face, and that FACE as applied to the facts of this case violates the First Amendment of the United States Constitution.  The Court will address each argument in turn.

## A.  Spoliation of Evidence

District courts have considerable discretion in imposing sanctions based on a spoliation theory.  *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 943 (11th Cir.2005).  A party seeking sanctions "must establish … that the destroyed evidence was relevant to a claim or defense such that the destruction of that evidence resulted in prejudice."  *Eli Lilly and Co. v. Air Exp. Intern. USA, Inc.*, 615 F.3d 1305, 1318 (11th Cir. 2010) (citing *Flury*).  In order to obtain an adverse inference, the moving party must also "establish that the missing evidence is *crucial* to their

---

interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services[.]"  18 U.S.C. § 248(a)(1).

ability to prove their prima facie case," *Point Blank Solutions, Inc. v. Toyobo Am., Inc.*, No. 09-61166-CIV, 2011 WL 1456029, at *1 (S.D. Fla. Apr. 5, 2011), and that the opposing party's failure to preserve the evidence was "predicated on bad faith." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). Mere negligence is insufficient. *Id.*

In this case, the surveillance tapes and the sign-in sheets were destroyed pursuant to the PWC's routine document maintenance policies. Even assuming that the Government had a duty to preserve the evidence at issue, which was created and controlled solely by the PWC,[5] Ms. Pine has not set forth evidence establishing that the Government was aware of the PWC's policies, or that the evidence even existed prior to its destruction. Although one might suspect that the Government was in fact aware of such facts, and that it purposely neglected to prevent destruction of the sign-in sheets and surveillance tapes because they were detrimental to its FACE claim, mere speculation is insufficient to support a finding of bad faith. The Government's failure to take the necessary steps to prevent the destruction of potentially critical evidence was indeed negligent, and perhaps even grossly negligent. Absent a showing of bad faith, however, an adverse inference is not warranted.

Furthermore, Ms. Pine has failed to demonstrate that the missing evidence was necessary to her case. With respect to the surveillance tapes, assuming the cameras actually captured the incident in question, the videotapes would not have provided much information beyond what is already in the record. At most, they would have revealed exactly where Ms. Pine's body was located with respect to the vehicle, how long the vehicle was stopped before she approached the driver to initiate conversation, and how long the conversation lasted before she was interrupted

---

[5] It is well-established that parties have a duty to preserve evidence upon anticipation of litigation. For evidence which is owned or controlled by a third party, some circuits impose a duty to give the opposing party notice of access to the evidence or of its possible destruction. *See, e.g., Silvestri v. General Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001). Ms. Pine has not provided, nor is the Court aware of, any authority indicating that this Circuit imposes such a duty.

by Officer Raja.   As discussed in further detail *infra*, these facts, though relevant, are not determinative.  With respect to the PWC sign-in sheets, the absence of the passengers' names would not necessarily prove that they were not seeking reproductive health services at the PWC. The passengers very well could have been seeking reproductive health services which do not require sign-in, such as pregnancy testing.   In any event, as discussed at length *infra*, the Government is not required to prove that the passengers were in fact seeking reproductive health services.  Although such proof may have relieved the Court from its lengthy discussion of this issue, it is not necessary to Ms. Pine's case.  Based on the foregoin reasons, the Court denies Ms. Pine's request for an adverse inference.[6]

### B.  Standing

The parties' disagreement about whether the Government is required to prove that the passengers entered the PWC premises in order to obtain reproductive health services, though couched in terms of the Government's *prima facie* case, also implicates issues with respect to standing.  The question arises as to whether a valid FACE claim presupposes a victim who is a member of the statute's protected class, *i.e.* whether the Government's standing depends on proof that aggrieved person is a provider or obtainer of reproductive health services.  In light of the various other reasons the passengers may have had for entering the PWC premises (e.g. to ask for directions), if the Court finds that such proof is required then the Government lacks standing and the remaining issues become moot.

---

[6] It is rather curious that the Department of Justice was able to meet with the PWC staff and police officers the very next day after the alleged violation occurred.  It is also curious that the Government failed to make any efforts to obtain the identities of the passengers who are the alleged victims in this case—the Court finds it hard to believe that the Government was completely unaware of the existence of the sign-in sheets and video surveillance system.  The Court can only wonder whether this action was the product of a concerted effort between the Government and the PWC, which began well before the date of the incident at issue, to quell Ms. Pine's activities rather than to vindicate the rights of those allegedly aggrieved by Ms. Pine's conduct.  If this is the case, the Court would be inclined to sanction the Government with, at a minimum, an adverse inference.  Given the absence of further evidence substantiating the Court's suspicions, the Court is not authorized to do so.

The general rule is that an individual seeking protection under federal civil rights laws must allege and prove that he is a member of the statute's protected class.  *See, e.g.,* App. to 29 C.F.R. Pt. 1630, App. ("As with other civil rights laws, individuals seeking protection under these anti-discrimination provisions of the ADA generally must allege and prove that they are members of the 'protected class,'" which typically means they must meet the statutory definition of "disability.")  There are, however, exceptions to this general rule.  For example, the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601 *et seq.*, one of the statutes on which FACE was modeled,[7] provides a private right of action to an "aggrieved person."  *See* 42 U.S.C. § 3613. "Rather than define 'aggrieved person' as a protected class under the act, the statute defines 'aggrieved person' as 'any person who—(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur.'"  *Wasserman v. Three Seasons Ass'n No. 1, Inc.*, 998 F. Supp. 1445, 1447 (S.D. Fla. 1998) (quoting 42 U.S.C. § 3602(i)).  Any person who fits within this definition has standing to bring a FHA claim regardless of whether that person is a member of the statute's protected class.  *Id.*

FACE's legislative history reveals that not only was it was designed to protect  patients and physicians directly involved in the provision of reproductive health services, but it was also was also intended to protect clinic staff, persons assisting patients or staff, family members of patients, physicians, and clinic staff, as well as mere bystanders.  S. Rep. No. 103-117, at 26. Unlike the FHA, however, FACE carves out from the general category of aggrieved persons a subcategory of those entitled to initiate a private action.  Private rights of action under FACE are

---

[7] FACE was modeled after several existing civil rights laws, including section 3631 of the FHA which prohibits the use of force or threats of force to willfully injure, intimidate, or interfere with a person's housing opportunities because of his or her race, color, religion, sex or national origin.  H. Rep. No. 103-306, at 10.

limited to those "involved in providing or seeking to provide, or obtaining or seeking to obtain, services in a facility that provides reproductive health services."[8] 18 U.S.C. § 248(c)(1)(A).  It is clear that if the passengers had initiated the instant action against Ms. Pine, they would in fact have to prove that they were involved in seeking or providing reproductive health services.

This action, however, was initiated by the United States Attorney General, in which case FACE provides different requirements for standing.  The Attorney General has standing to bring a civil action under FACE where he has "reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of this section." *Id.* § 248(c)(2)(A).  Noticeably absent from this section is the limiting language contained within the section regarding private rights of action.  The Attorney General may bring a FACE claim on behalf of any aggrieved person, regardless of whether such person is involved in providing or seeking reproductive health services.  As such, the Government has standing in this case despite its lack of evidence regarding whether the passengers were seeking abortion services at the PWC.

### C.  The Government's *Prima Facie* Case

#### 1.  Motive

The question remains as to whether the Government must prove that the passengers were involved in seeking or proving reproductive health services as part of its *prima facie* case. Motive is covered by the final element of a FACE claim, which courts consistently refer to as that of the *defendant's* motive.  *See, e.g., Roe*, 253 F.3d at 681.  This element is satisfied upon proof that the defendant was "motivated by a desire to 'prevent [a person] from obtaining reproductive health services.'"  *Id.*  "That is all the intent that the statute requires."  *United States*

---

[8] This limitation applies only to actions such as this which are brought under subsection (a)(1).  18 U.S.C. § 248(c)(1)(A).

*v. Weslin*, 156 F.3d 292, 298 (2d Cir. 1998).  *See also United States v. Balint*, 201 F.3d 928, 932

(7th Cir. 2000); *United States v. Lynch*, 104 F.3d 357 (2d Cir. 1996).  This interpretation is also

consistent with FACE's legislative history,[9] as well as other civil rights laws which focus solely

on the motive of the defendant.  *See, e.g., Latrece Lockett v. Choice Hotels Int'l, Inc.*, 315 F.

App'x 862, 868-69 (11th Cir. 2009) (focus of Title VII retaliation claim is on the beliefs of the

defendant/employer rather than that of the plaintiff/employee); *Fogleman v. Mercy Hosp., Inc.*,

283 F.3d 561, 565 (3d Cir. 2002) (Because Title VII forbids an employer from "taking adverse

action against an employee for discriminatory reasons, it does not matter whether the factual

basis for the employer's discriminatory animus was correct and that, so long as the employer's

specific intent was discriminatory, the retaliation is actionable.").  Where the defendant acted

with the requisite motive, a FACE violation may occur regardless of whether the offending

conduct was directed toward a person seeking or providing reproductive health services.  For

claims involving physical obstruction, as is the case here, there need not even be a victim at all.

*See Balint*, 201 F.3d at 933.

Though the viability of a FACE claim ultimately depends on the motive of the defendant,

under certain circumstances the Court may also consider the motive of the aggrieved person.  For

example, in *Roe v. Aware Woman Ctr. for Choice, Inc.*, *supra*, one of the issues before the

Eleventh Circuit was whether the plaintiff, a patient at a reproductive health clinic, adequately

pleaded the motive element of her FACE claim.[10]  The plaintiff's claim was based on allegations

that the defendant physicians refused her requests to stop her abortion and call an ambulance,

---

[9]  *See* H.R. Rep. No. 103-306, at 11 ("[FACE] requires that the offender be motivated by the involvement of the victim or others in obtaining or providing reproductive health services"); S. Rep. No. 103-117, at 24 (a FACE violation occurs "only if the offender has acted with the requisite motive").

[10]  The facts of *Roe* are decidedly unique and inapplicable to the instant case. However, the Court would be remiss not to discuss *Roe* as it is one of the few Eleventh Circuit cases which discuss the motive element of FACE and is heavily relied on by both Ms. Pine and the Government.

and instead restrained her in order to complete the procedure.  The court considered both of the plaintiff's possible reasons for wanting to leave the clinic, either to save the pregnancy or to have the abortion completed at a hospital, and found that if the physicians restrained plaintiff to prevent her from seeking either of these services, then they had acted with the requisite motive because both services are "reproductive health services."  *Roe*, 253 F.3d at 682.  However, the court declined to draw this inference and upheld the dismissal of the plaintiff's complaint because it was also possible that the physicians were motivated by a desire to protect the plaintiff's life and health and to prevent further injury.  *Id.* at 682-84.

Contrary to Ms. Pine's interpretation, *Roe* does not hold that proof of the aggrieved person's motive or intent is a separate element of a FACE claim.  Rather, *Roe*'s holding demonstrates that the failure to include specific allegations regarding the defendant's motive is fatal, which lends further support to the principle that a FACE claim ultimately depends on the motive of the defendant rather than the aggrieved person.[11]  The Court does not necessarily disagree that requiring proof of aggrieved person's motive or intent would serve to more narrowly tailor the statute to achieve its purpose of protecting women's right to obtain reproductive health services.  However, the Court is not authorized to impose requirements beyond those contained within the statutory text.  The Court need only determine whether the Government has set forth sufficient evidence that Ms. Pine, the accused, acted with the requisite intent.

---

[11] Ms. Pine also relies on *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir. 1996), wherein the Eighth Circuit, in dicta, concluded that the defendant's physical assault of a clinic's maintenance supervisor constituted a FACE violation.  The court based its conclusion on the finding that a maintenance supervisor is a provider of reproductive health services within the meaning of FACE.  Ms. Pine argues that the fact that the *Dinwiddie* court found it necessary to determine this issue means that a FACE claim requires proof that the aggrieved person is a member of the statute's protected class.  However, *Dinwiddie* involves allegations of force and threats of force which require an actual victim, whereas this case involves a claim of physical obstruction.  In any event, *Dinwiddie* is not conclusive on this issue, nor does its dicta outweigh the significant authority, including that of the Eleventh Circuit, demonstrating that a FACE claim requires proof of only the defendant's motive.

It is undisputed that Ms. Pine holds deeply-rooted personal beliefs against abortion, and that her mission is to provide women with information about the available pro-life alternatives to abortion and pregnancy assistance programs.  Although Ms. Pine also concedes that she was conducting sidewalk counseling at the PWC on the day of the incident, the Government has offered no evidence regarding the actual contents of Ms. Pine's conversation with the passengers.  In fact, Ms. Pine's deposition transcript reveals that the Government did not even bother to ask what was said.  The record merely reveals that Ms. Pine's sidewalk counseling generally consists of attempts to provide "life-affirming" information to anyone willing to receive it, including the mailman, delivery men, police officers, and others who obviously are not seeking abortion services, and that Ms. Pine does not press on once she realizes her solicitation efforts are not welcome.  It is evident from these facts that Ms. Pine's ultimate goal is to change the minds of women considering abortion.  However, attempting to influence people by peacefully sharing information about abortion alternatives with the general public hardly amounts to a desire to stand in the way of a person from obtaining reproductive health services, and the Court is not authorized to make any assumptions which are not substantiated by evidence in the record.  The Court thus finds that the Government has failed to provide evidence sufficient to prove that Ms. Pine acted with the requisite motive.

### 2.  Physical Obstruction[12]

With respect to the first element of a FACE claim, Ms. Pine asserts several arguments that her actions do not constitute a physical obstruction as a matter of law, none of which have been squarely dealt with in this Circuit.  First, Ms. Pine asserts that the passengers did not have a

---

[12] It is undisputed that Ms. Pine did not use either force or threat of force against the passengers.  It is also undisputed that Ms. Pine neither injured nor intimidated the passengers.  The issue is whether Ms. Pine's conduct constitutes an interfering "physical obstruction."

legal right to enter the PWC parking lot through the exit driveway, citing certain provisions under Florida state traffic law which makes it a non-criminal moving violation for a driver to disobey a traffic control device such as an "Exit only" sign.  Ms. Pine further asserts that the passengers could have entered the PWC through the designated entrance rather than the exit driveway.  Finally, Ms. Pine argues that her actions cannot constitute a physical obstruction because her interaction with the occupants of the sedan was "consensual."

FACE provides that "[t]he term 'physical obstruction' means rendering impassable ingress to or egress from a facility that provides reproductive health services…, or rendering passage to or from such a facility…unreasonably difficult or hazardous."  18 U.S.C. § 248(e)(4).  When interpreting a statute, the Court "must always yield to plain and unambiguous statutory text," *Polkey v. Transtecs Corp.*, 404 F.3d 1264, 1268 (11th Cir. 2005), which reveals that FACE contains no exception for ingress or egress constituting a moving violation under state law or where alternate methods of ingress or egress are available.  Neither does FACE contemplate the subjective mind state of the persons allegedly obstructed.  Rather, the physical obstruction element requires an objective analysis of the defendant's conduct and its effects on the alleged victims.  *See* 18 U.S.C. § 248(e)(4); *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 194 (2d Cir. 2001).  Furthermore, other courts have declined to read additional limitations or exceptions into to the definition of physical obstruction.  *See, e.g., Mahoney*, 247 F.3d at 284 ("The statute does not distinguish between frequently used and infrequently used means of egress, and we decline to write in such a distinction."); *United States v. Soderna*, 82 F.3d 1370, 1377 (7th Cir.1996) (broadly construing FACE so as to preclude arguments that a physical obstruction cannot occur where only one entrance is blocked).  Based on these principles, the fact that the passengers sought entry through the PWC's exit driveway rather than

the designated entrance, and the fact that the passengers were not upset by or may have even been receptive to Ms. Pine's solicitation, does not defeat the Government's FACE claim as a matter of law.   These facts are merely relevant to overall determination of whether the passengers' ingress was rendered unreasonably difficult or hazardous.[13]

The Government primarily relies on the Second Circuit case *Spitzer v. Operation Rescue National* in support of its argument that Ms. Pine's temporary stoppage of the sedan is sufficient constitute a physical obstruction under FACE.  This case is analogous only to the extent that the protestors in *Spitzer* walked across driveways in order to stop the progress of oncoming cars. Unlike Ms. Pine, the *Spitzer* defendants engaged in other protest activities such as shouting at and standing in front of pedestrians approaching clinics, standing directly in front of clinic doors in order to block entry and communicate with patients entering and exiting the building, and threatening clinic workers, including one defendant who told clinic employees that they would die before the day ended.  In upholding the preliminary injunction issued against the defendants, the court noted that their behavior was apparently "so extensive that it rendered building access unreasonably difficult."  *Spitzer*, 273 F.3d at 194.

Here, although the parties dispute the exact location of Ms. Pine's body with respect to the vehicle, the record reveals that Ms. Pine approached the driver side window *immediately* after the vehicle stopped, and engaged the passengers in a seemingly consensual conversation. Within a matter of seconds, Officer Raja intervened and the driver was able to immediately proceed through the PWC driveway.  This hardly rises to the level of extensive conduct engaged in by the *Spitzer* defendants.  Ms. Pine's conduct was no more obstructive than if Officer Raja

---

[13] The Court also rejects Ms. Pine's argument that her actions do not constitute a physical obstruction because other vehicles had room to drive around the stopped sedan.  The relevant issue in this case is whether Ms. Pine's actions physically obstructed the passengers of the sedan, and not anyone else.

himself had stopped the sedan and instructed the driver to turn around and enter through the designated entrance rather than the exit driveway.   Moreover, the Court cannot conceive that such an innocuous incident is the type of obstruction Congress had in mind when it enacted FACE.   The Court's interpretation of the law is guided "not just by a single sentence or sentence fragment, but by the language of the whole law, and its object and policy."   *Balint*, 201 F.3d at 933.   Moreover, courts must use common sense and should not interpret the law in a way which yields an absurd result.   *See United States v. Haun*, 494 F.3d 1006, 1010 n.3 (11th Cir. 2007).   Based on these principles, the Court finds that the evidence could not lead a rational jury to find that Ms. Pine's conduct constituted a physical obstruction within the meaning of FACE.

### 3.   Interference

To the extent that Ms. Pine's arguments with respect to the physical obstruction element also apply to the second element of the Government's FACE claim (whether Ms. Pine intentionally interfered with a person), the Court finds that her arguments fail for the same reasons.   FACE provides that the term "interfere with" means "to restrict a person's freedom of movement."   18 U.S.C. § 248(e)(2).   Just as with physical obstruction, FACE's definition of interference does not provide for any exceptions, nor does it require evidence related to the subjective mental state of the person interfered with.[14]   A FACE plaintiff need only prove that the "defendant intended to restrict the person or persons' freedom of movement."   *Roe,* 253 F.3d at 681.   In fact, the defendant's efforts do not even need to be successful, as FACE also prohibits attempts to interfere with a person.   18 U.S.C. § 248(a)(1).

---

[14] Unlike cases such as this which are based on allegations of interference by means of physical obstruction, FACE claims based on allegations that the defendant either injured or intimidated a person through force or threats of force generally require evidence of the aggrieved person's subjective mental state.   *See Spitzer*, 273 F.3d at 196 (proof of statement's effect on its recipient is relevant to determining whether the statement is a threat); *Dinwiddie*, 76 F.3d 913 (considering testimony regarding victims' reaction to defendant's statements in order to determine whether they were intimidated).   *See also* 18 U.S.C. § 248(e)(3).

In this case, it is undisputed that Ms. Pine approached the sedan in order to speak with and provide information about pro-life abortion alternatives to the passengers, and that the sedan stopped.  Ms. Pine has provided testimony that she does not try to stop vehicles or pedestrians who are not interested in receiving her information, and the Government has not provided any evidence to the contrary.  The Government has therefore failed to set forth sufficient evidence that Ms. Pine intended to restrict the passengers' freedom of movement, and the interference element of its FACE claim fails as well.

In sum, the record almost entirely devoid of evidence that Ms. Pine acted with the prohibited motive and intent or that Ms. Pine engaged in any unlawful conduct.  The Government has failed to create a genuine issue for trial on all three elements of its FACE claim, and Ms. Pine is entitled to judgment as a matter of law.

### D.  Consitutional Implications

The Court further finds that a contrary holding would violate Ms. Pine's right to free speech guaranteed by the First Amendment of the United States Constitution.  Congress, undoubtedly aware of FACE's potential First Amendment implications, specifically provided that FACE shall not be construed "to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution."  18 U.S.C. § 248(d)(1).  The legislation has been upheld in spite of its incidental burdens on expressive conduct because it furthers the important government interest of protecting a woman's constitutional right to obtain reproductive health services such as abortion.[15]  *Dinwiddie*, 76 F.3d at 923-24.  Although facially constitutional,

---

[15] Intermediate scrutiny applies to a content-neutral law which incidentally burdens expressive conduct. *Dinwiddie*, 76 F.3d at 923.  "A statute survives intermediate scrutiny 'if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that

Courts must remain mindful of the fact that an "erroneous application of [FACE] threatens to impinge legitimate First Amendment activity," which may even include aggressive forms of protest activity such as yelling and approaching persons. *Spitzer*, 273 F.3d at 195.  A person is entitled to express his or her views on abortion so long as by doing it does not interfere with another's right to obtain an abortion.

In this case, Ms. Pine was on a public driveway conducting a peaceful demonstration on an important topic of public concern, which is precisely the type of conduct Congress excepted from FACE's reach.  Stretching the terms of FACE to apply to this case so that delaying a vehicle for a matter of seconds constitutes an unlawful physical obstruction, or so that a desire to provide people with information about alternatives to abortion constitutes an unlawful motive, would unjustifiably impinge on Ms. Pine's First Amendment rights.  This is especially true in light of the complete absence of evidence that the passengers, who were seemingly receptive to Ms. Pine's solicitation, were seeking reproductive health services at the PWC.  There is thus no competing constitutional right to justify the burden placed on Ms. Pine's right of expression and hold her liable for a hefty civil penalty of up to $10,000.[16]  The Court is at a loss as to why the Government chose to prosecute this particular case in the first place.

---

interest.'"  *Id.* at 923-24 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968)).  "FACE easily passes this test," *id.* at 924, and has survived numerous First Amendment challenges.  *See, e.g., U.S. v. Wilson*, 154 F.3d 658, 662 (7th Cir. 1998) ("the conduct prohibited by FACE is not protected by the First Amendment"); *Unterburger*, 97 F.3d 1413; *Cheffer*, 55 F.3d 1517; *Soderna*, 82 F.3d 1370; *Am. Life League, Inc. v. Reno*, 47 F.3d 642 (4th Cir. 1995); *Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists*, 290 F.3d 1058 (9th Cir. 2002).

[16] Ms. Pine also argues that the civil penalties authorized under 18 U.S.C. § 248(c)(2)(B) are facially unconstitutional because they criminal rather than civil in nature, and therefore deprive individuals of the constitutional protections afforded to criminal defendants.  Having already concluded that the Government has failed to establish its *prima facie* case, and that FACE as applied would violate Ms. Pine's First Amendment rights, the Court declines to analyze the constitutionality of FACE's civil penalties.

IV.     **Conclusion**

In conclusion, the Court finds that the Government has failed to set forth *prima facie* evidence on all three elements of its FACE claim—that Ms. Pine's conduct created a physical obstruction, that Ms. Pine intended to interfere with the passengers' freedom of movement, and that Ms. Pine was motivated by a desire to prevent a person from obtaining reproductive health services.  Further, imposing liability upon Ms. Pine under the circumstances of this case would unjustifiably burden Ms. Pine's rights under First Amendment of the United States Constitution. For these reasons, Ms. Pine is entitled to judgment as a matter of law.

The Court has carefully considered the motion, response, reply, applicable law, and pertinent portions of the record.  For the foregoing reasons, it is hereby

**ORDERED AND ADJUDGED** that defendant Mary Susan Pine's motion for summary judgment **[DE 66]** is **GRANTED**.  Final judgment will be entered by separate order.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 13 day of January, 2012.

/s/ Kenneth L. Ryskamp
KENNETH L. RYSKAMP
UNITED STATES DISTRICT JUDGE